Rebecca Pennell representing Ashone Hollinquest. Your honors, there is no firearms exception to the Fourth Amendment. That being the case, an anonymous complaint that someone merely has a gun is not a basis for a stop, let alone a stop that has all the trappings of a custodial arrest. And that's what we have here. There's two claims that we're making. One, that the stop was not based on reasonable suspicion because the anonymous complaint was not sufficiently corroborated. And two, even if there had been reasonable suspicion, the force used was excessive, making it a de facto arrest without probable cause. And everyone below me agreed that there was no probable cause to arrest at the time that guns were drawn, people were extracted from the car, they were handcuffed, and they were placed into different squad cars at the scene. But going to the initial issue of whether or not there was reasonable suspicion, the only thing that we're dealing with is a tip. And I think it's very important to keep in mind that none of the testimony from the police indicated that anything they saw when they first arrived was independently suggestive of a crime. They saw a verbal dispute and a person who had one hand not visible. That distinguishes this case from many cases where there's an anonymous tip and usually what you need is predictive information. That is the gold standard. That's what the Supreme Court said in Florida v. J.L. You need, there's none of that in this case. It's very clear. All you had was static facts. And there were a number of cases that occurred before Florida v. J.L. where I think there was some confusion as to whether or not static facts could be enough. Supreme Court in Florida v. J.L. was quite clear that you can't just, it has to be more than anyone on the scene observing someone and being able to call in and say, this person has a gun. That's all we have here. We have no predictive facts. Well, I put into one side predictive and I understand what you're saying about predictive and predictive being gold standard. Here's what we do have. We have a call that goes in. We know who's calling and the person says, somebody says they have a gun. And I think the district court and everybody treats this quite properly as anonymous because we don't know who the original source was. So the police show up. They see somebody standing, I guess it must be on the rock or something, standing on the floorboards. So he's behind the door. One hand's out pointing. The other hand is out of sight near his waist somehow. The security guards are pointing at the SUV like obviously, hey, this is what we called you about. There's an argument going on. It's late at night. It's one something in the morning. This is a nightclub. They're on the premises. What should a police officer do? Just sort of say, there's nothing here. I got to go home? Yeah, I think that's the right question. That's certainly what I ask myself. I think there's a few things. I think that the dispatch officer should have asked more questions initially because it's very curious to me when the person says this guy has a gun, people are saying he has a gun. What's he doing with it? Oh, no, he just has it. Well, why are you concerned about that? Because it's a gun. Well, but it's lawful to have a gun. I mean, and it's not a crime just to have  It's lawful to have a gun, but it's also within the police's authority to determine whether or not the gun is being possessed lawfully or if there's an argument and a weapon is getting ready to be discharged, the police don't have to wait for the actual shooting before they investigate. Well, the Supreme Court said you need more than that. In Florida v. J.L., the there were some circuit courts that said, well, you can act just based on that. Well, that was a purely anonymous tip, though. This is a purely anonymous tip, too. No, it's not, because the police were able to identify a person as a contact. The person didn't say, you know, this guy has a gun and hangs up. The police were able to identify who was giving them the information, and when they arrived on the scene, they could contact that person to get more information if more information were needed. So this is not truly the classic anonymous tip. I disagree, Your Honor. The government has a burden of proving that it's not an anonymous tip, and Mr. Montijo, the person who called in, even testified at the hearing, he doesn't know who this person was that gave him the information. He has no recollection. The government never established But at the time he did. But at the time he knew who it was. Well, there's no evidence to that. There's no evidence that even at the It was rumor going around, and he himself, Mr. Montijo, the person that called the police, had no direct knowledge of it at all. So it was an anonymous tip once removed because the anonymous tip went to Mr. Montijo instead of the police. So it was a pure anonymous tip. Importantly, that there was no allegation of a fight, of a threat, of a display of the firearm, just someone has a gun. That's it. But the question is, what do the police know, and what can the police reasonably suspect once they arrive on scene? So once they... And once they arrive on scene, they know more than the information that came from the telephone call. So as you look at the totality of things that the police knew once they've arrived on scene, and they see the man pointing, sheltered behind the door, one hand out of sight, arguing, they see the security guards pointing and so on. I ask again, are the police supposed to just leave this alone and let it develop? I think that they can do a few things. I think based on the lack of corroboration at that point, I think they can attempt a consensual encounter. For one thing, the testimony is that as they were arriving, things were breaking up. So whatever concern there was about things going away at that point in time, the people that were outside of the car were leaving, the people that were in the car were starting to get in the car. But they certainly could have said, hey, we want to talk to you. They were approaching from the rear. Judge Shea did not make any adverse findings that there was some sort of attempt to flee. It looks like there was some confusion. The testimony was the car started to move before Officer McClintock told the car to stop. But things... They stopped fairly quickly. At that point in time, was it necessary? The standard is going to the second issue, was the amount of force used reasonable? Was it the least intrusive means necessary? Once the car was stopped and everybody's hands were up, did they need to physically extract all three passengers from the car? Did they need to handcuff them? Did they need to place them in squad cars? Was that necessary, given the circumstances, given that they didn't even know that there was a crime? Most of the cases where you get this type of thing are bank robbery cases or cases where someone's threatened to bomb something. This is something where someone has supposedly an anonymous complaint of a gun that he's done nothing with. That is an extreme use of force for those circumstances, at the very least, once they developed that level of compliance. And if you read through the record, it's telling to me the amount of force shown. If you read the testimony of Officer McClintock and Lawrence Adams, one of the people that was interviewed, they handcuffed Mr. Adams, a witness, while they interviewed him. And I can think of no reason for that. Why would you handcuff this supposed victim, I guess, if he was being verbally assaulted and perhaps with a firearm at that point? What does that have to do with your client? I think it colors the picture of what was going on there. They came in before they saw the fight with sirens going, or with their lights on, at least. The testimony was very clear that they had their lights on. So that's a sign of we're going to be doing a walk-through to ask some questions. From the get-go, it was very aggressive. And that's very contrary to the Supreme Court's authority saying mere firearms possession alone is not a basis to stop someone. And like I said... Do you want to save your last two minutes for... I do, Your Honor. Thank you. Thank you. Good morning. May it please the Court, Alexander Eckstrom, on behalf of the first question posed by Judge Fletcher, what are the officers to do? It's the government's position that the officers are faced with, under these facts, a binary choice. They show up and the vehicle begins to move. They either can let the vehicle go or they can investigate. And it's the government's position that under the totality of circumstances in this case, what the officers did was reasonable. Well, wasn't there just an anonymous tip in this case? There was an anonymous tip. However, as Your Honor has pointed out earlier, it falls somewhere between the classical anonymous tip and the non-anonymous tip in the sense that you do have a responsible party who is part of the Red Lion security staff, a known group of people who are responsible for the information that they're giving out. It is, admittedly, information that was gathered by the caller from another individual. I believe the record shows that the caller was standing next to a group and someone said, he's got a gun. And that was the basis. However, in this instance, it's not just the content of the 911 call, but what the officers said they received from dispatch. The officers weren't listening to the 911 call. And what they had was information of an individual with a gun, a physical description of that individual wearing a blue shirt with a white undershirt, a second individual wearing a gray sweater, alternately described as a hoodie. Yeah, but you can't give to the officers responding to the scene a higher degree of knowledge than the person at dispatch receiving the phone call. Certainly, Your Honor. And in fact, in this instance, there was less detail provided to the responding officers than there was on the 911 call. Right. So, I mean, 911 call, to the degree it's an anonymous call, it remains an anonymous call when the officers show up. Certainly. However, the responding officer, Officer McClintock, indicates in the record at Excerpt of Record 56 that he has experience with Red Lion security. He knows it's coming from Red Lion. He knows the Grizzly Bar is located at the Red Lion. He knows these folks have been helpful in pointing out problems in the past. And he also knows, as part of the totality of circumstance and this officer's specific knowledge, that in his words, a lot of the times the problems in the bar get out into the parking lot. Can you help me understand what's going on with respect to the vehicle moving forward? Because the testimony seems to say that it moves, I mean, for over a long period, a very short distance. Is the break off and the guy standing there, kind of the floorboard that's rolling forward, I mean, help me understand what was going on. I believe Your Honor is referring to the portion of the testimony where the period of time in which the vehicle is rolling is described as 30 seconds. Yes. And the distance traveled is? Yes. How far?  By the same officer, Officer McClintock. But in neither case exceeding the speed limit. It's not a log skidder, Your Honor. And so, yes, it's very, very slow. Yeah, yeah. So it sounds as though if that testimony is accurate, the car is simply rolling forward. I mean, that doesn't sound as though somebody's sitting in the driver's seat with his foot on the gas. It sounds as though he may still be standing on the floorboard pointing or whatever. I mean, it just seems to me that there's trouble thinking that someone is actually driving the car at that speed. Your Honor, the government would have to agree that it's consistent with a vehicle in drive, which was the testimony of Officer McClintock, that he actually took it out of drive into park as he removed the driver, but with the vehicle running. In this instance, the government believes that that's request to show hands, request to stop the vehicle before the vehicle does finally stop. And the officer's presence was clear. There was testimony from officers that they were speaking aloud in a voice that they were confident they were heard, but yet the vehicle continues to creep forward. And is the defendant sitting in the driver's seat at that time? The defendant is the passenger directly behind the driver. I mean, I should ask it this way. Is there someone sitting in the driver's seat in a position to control the vehicle as it's rolling forward? Yes, Your Honor. Yes. Who was later removed from the vehicle by Officer McClintock, the first arriving officer. Speaking of vehicles, Mr. Montillo said that the people had just pulled up in an SUV. And then later he says they hadn't parked it, but apparently that they were outside and they had just pulled up outside. When some people said this guy has a gun, they knew him. And he was in the lobby and they're outside, he says. There's no statement that they had gone into the bar, is there? There is no statement in the original 911 call that they had gone into the bar. However, by way of explanation, because we learned later that they had in fact been in the bar and had in fact been in an altercation from security, the government would suggest that the word just should be treated as perhaps not having the meaning of exactly. That much like getting off of a vehicle means to get out of a vehicle, it may not mean a small period of time. And again, what was communicated to the officers was simply that there was a person there with a gun. In the parking lot? In the parking lot, yes. And is there anything illegal about being in a parking lot with a gun? It all depends upon what you're doing while you're there. And so certainly your presence in a parking lot with a firearm, no. However, Judge Shea found that not only the initial call, but the totality of circumstances upon arrival led the officers to reason. That totality was that someone who may have had a gun was pointing his finger at somebody else and they couldn't see his other hand. Correct. And that's the circumstances which justified the police action? That in addition to what they knew about the area they were responding to and the fact that, I'm sorry, I don't mean to interrupt you. No, no, go ahead. And the fact that based on their experience with security and the Grizzly Bar inside of the Red Lion, that the problems often spill out into the parking lot. And we're at bar close. We're at about 140 on what I believe the court can take judicial notice of being early Sunday morning, the 13th. But all of the Mr. Montillo's suggested, testimony suggests, or his phone call, is that they just pulled up and that they, I don't know what he means by they didn't park the but they were outside. Uh, he doesn't say they came to the bar. Uh, there's no testimony when he calls that they went to the bar. Yes, they had a gun in the parking lot. Somebody else told him that that is correct, Your Honor. And there's nothing wrong with having a gun in the parking lot. No, Your Honor. However, under under reasonable suspicion, if you at bar close, see an argument in the parking lot. Um, I didn't. Does anybody say anything about an argument in the parking lot? Are you talking not about the tip? You're talking about what the police saw? Right. And what the police saw was that he pointed his finger at somebody. And when they got there, it was breaking up. Well, Your Honor, I would I would suggest that another interpretation of it, which is supported by the officer's testimony in the record, is that it didn't just break up. It broke up because they saw the flashing lights. And so so left left to their own. It wouldn't have. The argument may not have stopped. Well, whether it was whether then what are you concerned about a past crime or a future crime? Uh, the court found the potential for both. What was the past? The court found that it was reasonable to assume, uh, reasonable to suspect that the defendant may have been inside the bar with a gun. Yeah. And reasonable to suspect that the future crime had been avoided by the police. That there was that may have been avoided or may have been postponed. Um, when you run into something like this, um, as we later learned through the record, this was part of a continuing dispute between the individuals. One of the disputes which had occurred the day earlier. But it was not unreasonable for the officers to think that this would not perhaps be the end of it. And they had information that there was a gun involved. And I see that I'm out of time. Let me ask you this, if you don't mind me taking you over. Certainly. Assume that the officers come on the scene the way they've done. Assume further, although this turns out not to be the case, that the defendant is gesturing with his left hand. And indeed, he has a gun in his right hand, which I think he did not. He did not. What's illegal about arguing while you have a gun on your right hand? You're not pointing the gun at anybody. What's what's what's the crime? Uh, there's reasonable suspicion for unlawful display under Washington state law. But he's but he's got nobody seeing it's behind the door. He's not displaying it. I mean, that's that's that's the point of the if they can see the gun that he made that he may engage in off unlawful display. But they can't see the gun. You said if they see the gun? No, they don't see the gun. I'm hypothesizing that he has it, which is what they suspected. But, of course, they say all they know is his hand was down by his waistband in his waistband by his waistband. They don't see the hand. They know that they've got this tip that he has a gun. They know that he's arguing that he's pointing with his other hand. Tell me crime that justifies an arrest. Well, you you do have, um, you do have disorderly in the parking lot. You have the, um, the violation of 941 300 D, as I indicated earlier, which is reason to believe possessing firearm on premises, which is age restricted a bar. Um, that is to say that they had the gun when they were in the bar. Yes, that's a pretty slender read. The tip doesn't even say that the tip says has a gun. Yes, the tip did not say had a gun, right? And they never even seen these guys in the bar. That that is correct. Um, and and the government is saying that that's reasonable based on what they know about the area past contacts and and that the arguments in the bar often spill out into the parking lot. Have I answered the court's question? Thank you. Thank you. Yes. Your Honor, it would not have been reasonable under the collective knowledge doctrine for the officers in this case to think there had been a fight in the bar that spilled out onto the parking lot. The dispatch operator asked if the individual in question had been kicked out of the bar or what? And Mr Montejo said no, they just pulled up in the SUV. So it would be unreasonable to think that there was some ongoing fight going on or anything related to what you have in the bar. So what you have is an individual outside of the bar. And if you ask yourself the question of what the Supreme Court was concerned in about in Florida versus J. L. Is there a danger just based on what we know before the guns were found? Is there a danger that someone looking at the scene who doesn't like these three men at the pulling up to the Red Line Hotel who doesn't like them wanting them to leave, wanting them to harass them, is it fully possible that the person could have just called and lied in order to do that? Yes. And in fact, it's consistent that there would be no allegation of a dispute in the initial tip. And yet when they come on to the scene, there is some sort of verbal dispute indicating that there's some degree of dislike between people. Let me ask you to respond to the response I just got. I said, okay, what's the crime? We see the guy arguing. We think he has a gun. Turns out he does have a gun, but nobody sees it. What's the crime? And the response is, well, there's a crime of disorderly conduct that he could have arrested for. And then he gave me a number that I didn't understand. Okay, so what's your response? I think he was referring to the folks in the bar. And again, I think the facts are very clear. It would be unreasonable for them to have thought that there were people in the bar with a gun. And so then you're left with someone jabbing their head. Would you stop someone? No. It's a First Amendment right to have a dispute with someone. And a Second Amendment right to have a gun. There you go. Judge Reinhart's a well-known advocate of the Second Amendment. Well, you want to give people guns, you have to take some risks. But let me ask you this. Let me pursue this question of disorderly conduct. I assume it is a crime in Washington, too, and you can't arrest someone for disorderly conduct. What is disorderly conduct? It has to be more than just a dispute. It has to be something creating some sort of risk of vandalism. And Mr. Eckstrom, who is a county prosecutor, would know this better than myself. But some sort of risk of harm greater than just a protected speech. You don't have to talk cordially to everybody. You can have a heated dispute, be it over politics, be it over gun rights, be it over what you have. Jabbing a finger at somebody would not be protected speech. And where's the line between, I'm really yelling at you, and I'm just exercising my right. I mean, what point are the police... The reason I'm asking this is the police are here in a kind of a fix. They've got a report that there's a gun. They're coming in and they're seeing a real argument. They're seeing somebody jabbing his finger at somebody. And is it reasonable for them to think that there is a sufficient degree of conviction based on this? It's got to be a reasonable suspicion that they can be in arrest for disorderly conduct. I think without further investigation, no. People are, like I said, allowed to have disputes, especially where it seemed to be breaking up. So there doesn't seem to be anything escalating. Yeah, but what about the response that I got, which seems to me perfectly consistent with the record? When cops show up, sometimes things do break up. Sometimes, in fact, people run away. They didn't seem to have run away, but they did, you know, okay, listen, the cops are here. Sure, and in that type of potential crime, where the potential crime is, is this dispute going to become physical? If it never becomes physical because the cops arrive, there's just no crime that ever occurred. It's not that sort of attempt thing where you could say, well, attempted disorderly conduct because they were in a verbal dispute. I just don't think it rises to that level. But I think that they could, given that there's no real crime that's at issue, they could try to talk to people, they could come in and do the walkthroughs that Officer McClintock talked about that he would do if they're concerned or just wanted to create the peace. Okay. Thank you. Thank you. Excuse me, can I ask you a question a minute? That section that you rattled off, that Judge Fletcher says he didn't understand, what section was that? What's the number and what's the offense? It's the revised Code of Washington, Title 941-300, subsection D, and that is referenced in, I believe, the district court's order and also in the government's brief. And what's that stand for? That is the possession of a firearm in an establishment with an age restriction. That's not a disorderly conduct. That is not disorderly conduct. Okay. And did the district judge talk about disorderly conduct as a permissible basis for the arrest? No. That was not specifically mentioned in the court's order. Or unspecifically. That as well. Right. Hint of that. My time for argument is over, so I shan't abuse it. Thank you. Thank you. Thank you both very much. The case is arguably submitted.
judges: Reinhardt, Fletcher W. , Rawlinson